Good morning. Excuse me. My name is Steve Skinner from the law firm of Andrew Skinner here in Seattle, and I represent Appellants Illinois National Insurance Company and Lexington Insurance Company on this appeal. As a preface to my remarks this morning, I would like to note that the general proposition, commercial general liability policies like those at issue in this case are not intended to insure any and all liabilities of the insured, including what would properly be characterized as standard business risks. Oregon Courts, as well as the Ninth Circuit, has recognized that liability policies are not a warranty or performance bond for a contractor's workmanship. And thus when assessing the issues that we've presented here today on appeal, I think it's important to keep this principle in mind that the policies issued by my clients did not act as a guarantee of Appellee Wilmar's work or product or provide coverage for damages to Wilmar's work or product when it fails. In this case, obviously you have offered a number of policy reasons why you shouldn't have had to defend this case, but I'm not sure the time will allow us to get to all of them. Is there one you're particularly in love with if you were so limited without waiving anything relative to the others? You read my mind, Your Honor. With the Court's indulgence, I'd like to at least initially focus on the land subsidence exclusion in the appellant's policies. And under this exclusion, the insurer's precluded coverage for any liability arising out of land subsidence. It is undisputed, and I think the District Court's opinion and ruling reflects this, that the underlying claim arose out of damage to the house at issue that was allegedly caused by earth movement or, in our view, land subsidence. Under a fair reading of the land subsidence exclusion, there would be no coverage for the underlying claim since the exclusion bars coverage for any liability arising out of such subsidence. But it doesn't say based on any cause, therefore, and that gets us into all these cases that you've all cited to us, in which, as I read them, there are a number of different cases interpreting similar but not identical contract language that basically come out the other way, that there is a distinction to be made between land subsidence from natural causes and land subsidence from man-made causes. And I don't think there's any dispute here that there was man-made action with regard to the fill and the engineering for the fill and the decision to build it in a stream bed and so on, on which the foundation was then laid. Of course, that was the argument that Wilmar presented to the District Court and presented on appeal. But it's an argument that has found favor with a number of courts around the state interpreting these kinds of clauses in policies. And I guess my question for you is, I mean, given the rich precedent that exists here, you know, why didn't your client write the language into the exclusion that courts have upheld as against these kinds of claims by simply saying, you know, based on any cause? Well, I guess to answer your immediate question most directly is, simply because a policy provision could be drafted differently doesn't necessarily make it ambiguous in the first sense. You still have to interpret the policy as written. And it would be our view that the policy as written, where it refers to any liability arising out of land subsidence, doesn't get you to the point where you need to have a discussion of the causation of the land subsidence. We would submit that that on its face takes care of the question that you just asked. But, of course, it's kind of odd because we then have to parse these and the any cause language appears in the other exclusions, does it not? Well, I would respectfully disagree. It does appear in some exclusions, but it doesn't. Not all. So that would make it. The only thing I'm saying is that if that's the intended result, the policy does that in certain instances. It doesn't do it here. So what are we to make of that? Well, first of all, again, I'm not sure it's appropriate to interpret one exclusion by referring to another exclusion. I believe that the policy provision should stand on their own. I think if you were to, and when you say the exclusions, I assume you're referring to the exclusions in the policies, not in these other cases. Not other cases, not other policies. Understood. And I think if you look at the entire body of exclusions, you would see a number of exclusions that use the arising out of language that was used in the lands of sightings exclusion issue here. And I don't know that arising out of pollution or arising out of lead contamination necessarily requires that you explain why something is how it came to be. It just says any liability. And I guess for that matter, if we were referring to any liability arising out of fire, and I'm just using that as a hypothetical, we wouldn't be sitting around discussing whether it was a man-made fire or a natural fire. It's any liability arising out of fire. So I don't think you'd get to that point. Well, it might, though, if your hypothetical included examples of what might cause a fire, a gasoline explosion, lightning, you know, and it would depend if we apply the, what is it, adjustum generis doctrine. I can never pronounce that. It would depend on the examples that are given in the text of the paragraph that might cause a problem, even for your fire example. Well, and I was just getting into the adjustum generis point. And I was recently at a conference where Justice Scalia was, he asked everybody to raise their hand who knew what that meant. Nobody in the crowd raised their hand. You didn't raise your hand? Oh, I was afraid I might be questioned. Hold on. Yeah. It's kind of intimidating. It can be. But in any event, first of all, I would note that the practice of reading into this exclusion language such as naturally caused would be in violation of Oregon's statute regarding the interpretation of written contracts. We've cited that in our brief. And I think that it's important that to get to where Wilmar would have this court go invites violation of that interpretation statute. But with respect to the adjustum generis argument, and specifically the analysis that was put forth in, I believe, the Wisconsin Builders and Nautilus cases that were cited by Wilmar, those courts adopted an adjustum generis analysis that has not been approved by Oregon courts. And I think that's important to keep in mind. If we're going to treat these as persuasive authority, obviously from other jurisdictions, so it's not as though they're controlling on this issue. But they don't follow the methodology that Oregon courts have adopted with respect to adjustum generis. And, in fact, in that case what the courts did was they took a general term that was followed by specific terminology afterwards and said the specific terms modify the general. Oregon courts, as we've referenced in the clinical research case, the Oregon Supreme Court, or at least appellate court, has said we don't do it that way. It's got to be the general term following the specific terms. And, of course, in this case you've got a general term followed by specific terms. So under the ruling in clinical research, adjustum generis should not apply to modify and limit the general terminology. And I guess the other point I would make is the language of our exclusion, the lands of sight exclusion, when it lists out this movement of land or earth also says included but not limited to. So it isn't intended to be a list of the universe of potential land movement. And I would also note that this list of land movement necessarily requires the court to accept that this list is somehow all naturally caused. Well, that's what I was going to ask you because certainly, you know, we know about earthquakes, mud flows primarily. But settling or sinking of land, I suppose you would argue, is not necessarily man-made or natural. Some of these are either one or no. No. I would say that the vast majority of them could be caused by both man-made causes and natural causes. For example, just an earthquake. I would disagree with that. In the last year, I think if you were in Seattle and there was a playoff game here for the Seahawks and there was a play in the stadium that got the locals so excited that the local monitoring stations for geotechnical purposes found that there had been a detectable quake of the earth that was apparently caused by the fans in the stands. So an earthquake, albeit a minor earthquake, could be man-made as well as probably natural. So I guess looking at this list of causes, it isn't fair to say that they are one way or the other. So to conclude that it's intended to be limited to natural causes, it isn't in the language of that exclusion. And for that matter, I don't think it's supported when you just take a look at these specific causes that are listed. Let me ask you sort of a related question, because it's easy in these cases to lose sight of the fact, if you're not careful, that this is about a duty to defend and not a duty to indemnify. And is it reasonably clear, since as I remember it, there wasn't a lot of discovery done in this lawsuit, was there? In the coverage lawsuit? Coverage lawsuit. No, there was an exchange of written evidence. And so there's not going to be an argument, is there, that subsidence issues was just one string in our bow and that we also claim that the foundation, they used bad mortar and the concrete and those kinds of things? To my knowledge, the only arguments that have been made to this point had to do with the settling of the soil underneath the house, That was the alleged wrongdoing of Wilmar. That's what we understand. And, of course, the case was settled, so we don't have any record of what actually played out. And certainly the district court, in its ruling, focused solely on the earth movement issue. We believe that the land subsidence issue should be the end of the analysis, and obviously we've identified some other exclusions that deal specifically with the insured's work, which we understand they're not disputing that this case involves their work. And these exclusions would apply. That is Exclusion J6 and Exclusion L. And I guess I will reserve the remaining two minutes of my time to respond to any points. Thank you. If it pleases the Court, my name is Paul Connolly. I'm from Salem, Oregon. With me is Tyler Malstrom, an attorney in my firm who assisted in preparing the brief. As the Court noted, there's a number of attacks on the liability on the part of the insurance company in regards to a duty to pay. But this is really a duty to defend case. And as a consequence, I think we have to park much of the analysis and look at Oregon law on when an insurance company must defend. The policy behind essentially relaxing the standards and having a low bar is because courts don't want to have trials within trials to determine whether in fact there's a duty to defend. What often happens, of course, is there'll be an acceptance of the defense with a reservation of rights. And at the end of the day, a jury may come back and may determine that, in fact, an exclusion did apply or did not apply. We're at the early stages of the matter here. And as a consequence, as with most states, our courts of appeals have provided interpretive guides for these duty to defend cases, which is that if there's a possibility that the policy provides coverage of the claim and there's a duty to defend, any ambiguity in the complaint regarding whether the policy covers the allegation is resolved in favor of the insured. Those are the two that I think we would ask the court to be considering as it considers the appellant's arguments. Now, there are a number of issues out there, and I will again say that I cannot cover all of them. They're well briefed, I think, by our side, and Judge Aiken, I think, disposed of those issues, applying the law as it should be. I will note just one point. I heard my opponent start by saying that insurance policies are not intended to be essentially bonds for the negligent acts of the insured. We agree. That is not the intent behind our claim. What I have heard asserted as a basis for denying coverage is the completed operations coverage. Now, that oftentimes is a language of exclusion in these policies. In this particular case, the record reflects that our client purchased coverage called completion operations, which is a grant of coverage in this particular case. Judge Aiken pointed that out, ruled in our favor in that regard. So all of the cases that I read cited by my opponent in regards to no bonding, not intended to insure the insured's bad work himself, are all cases where I believe the completion operation language was being used as a defense, not as a grant of coverage. Let me ask you to go to the subsidence, if you will, because that's an important issue. The point that we... First ask, do you agree with him that Oregon doesn't speak Latin on this particular subject, as he explained it? Well, the case that he has cited is the clinical research case. That case ends with certainly an uncertain disposition or interpretation of the provision. In fact, the court says it's questionable whether the rule is applicable here. Indeed, the phrase such as is indicative of a non-exclusive list of examples. I don't think the court really applied it, but when it did apply it in this particular case, it was a list of particulars followed by a general term and all such other provisions or events. And what the court essentially said is, well, with that kind of language, we're going to not change the actual items that are listed in the list of exclusions, but we'll look at the exclusions themselves. I think, Judge McAllen, you pointed out that the particular language in our subsidence exclusion situation are, at least from our standpoint, all naturally occurring events. Why is that? I mean, I don't know that I said that. I asked him about that, because I read those, and I could see that I disagree with him on the earthquake, to be honest, but the others, a number of the others, it would seem to me could be either. Well, I suppose they could be either. I mean, in other words, settling of land could occur naturally, or it could occur because of man-made causes, could it not? It could, and then I think you get into the Wisconsin builders and the Nautilus case where the court said, if that is the case, then it's ambiguous, and we then have to use rules of interpretation to determine how we resolve the ambiguity. But then it seems to me that movement of land or earth, I mean, using rules of interpretation wouldn't necessarily get you to your result, would it? Well, it would if the court were to examine those items. You know, from effects, and say, you know, those could be either one or the other. It's unclear what the drafter intended, and therefore we have to resolve that ambiguity, and in order to do that, certainly one of the ways in which you can do that is looking at other exclusions in the policy, and there was clear intent by the drafter in the ones we cited, which is I believe fungus and a couple of others, where the language says regardless of cause. So there the drafter intended that there be a clear statement that under any circumstances, man-made or natural, there was going to be an exclusion. That in and of itself creates an ambiguity. Why is there an ambiguity if there's a mixing and a matching, for example, if you've got natural and ones that are both natural and man-made? Why is that an ambiguity as opposed to basically a delineation of a broader exclusion? Well, because the intent of the drafter clearly intended by not putting regardless of cause there to suggest that that cause was not necessarily an issue, and certainly when you say regardless of cause, you're referring to either natural or man-made, and so as a consequence, what we're suggesting is when you read those, I think the court itself is struggling, saying, well, maybe it's one, maybe it's another, and as a consequence, if that's the case, then that's an ambiguity, which is resolved in our favor under the duty to defend cases. And in order to get to the next step, which is, as the court pointed out, why doesn't the insurer, which had opportunities and did, in fact, in this policy, state very clearly regardless of cause as a basis for the exclusion, not use it there? And it implies that cause is an issue, and if cause is an issue, then you resolve it by looking at other interpretive bases. If the court cannot, then the third leg of the analysis is, well, then there's an ambiguity, it's unresolvable by the policy, and this is a duty to defend case, and that's resolved in our favor. The problem I have with that argument is this, that I can understand the interpretation of this kind of clause in the context of a homeowner's policy because you don't look to generally fault to the homeowner. You look what damage was done, what are we covering. Frequently, acts of God, acts of war, those kinds of things are excluded because from an underwriting standpoint, you just can't figure out what kind of a premium to charge for them. But this policy is about what Wilmar did wrong, and to me, if the subsidence exclusion doesn't apply, then the clause is a nullity. They would have no liability if an earthquake damaged this person's house. They might under a homeowner's policy if they didn't exclude it, but they'd have no liability if an earthquake damaged this house. If it doesn't apply to things that Wilmar did wrong, then the clause has no meaning at all. I understand the point. I go back to reading the actual language, and the actual language in my mind, in contrast to the Ruud case, which is a 2009 Oregon case. Judge Landau did an analysis and looked at the land subsidence exceptions and said, in that list, you have overly compacted soil as a basis for declining coverage, and said, well, that shows an intent that man-made clauses can be a basis for non-coverage. In our particular case, while the effects could be either man-made or not, I believe that one would read those as naturally caused, and therefore the earthquake that causes the loss of a house would be excluded. However, issues that relate to design, fill, placement of the home, and others, that causes the house to sink, whether it's land subsidence or not, is an issue that's out there, because that hasn't been resolved. If you look at the complaint, it appears to cover any number of possible possibilities. Then I think the courts would say that you have to establish that it is a man-made cause, and that would be a basis for coverage. Otherwise, you have other provisions, Your Honor, that essentially say, well, the contractor causing these effects is not covered, which we concede. The subcontractor who could have been, and is listed as an agent, could. There is an issue that's come up in the reply brief, and I just want to briefly note it, Your Honor, and it entailed us to add a little bit of research. And we would like to be able to get this to the court, and I'm not sure what the proper mechanism is. The issue is regarding the term subcontractor. The contention by the insurer is that as a subcontractor, that is a covered act. In other words, a subcontractor who is negligent and causes damage is covered. The complaint lists the claim against agents of the entity. And the contention is, well, you have an agent, you have a subcontractor, they can't be the same. And we dispute that. And the research has not been provided to the court because it essentially came up in the reply. But I would point out that there is a citation by the defense, the appellants, to a case, to a statute which defines subcontractor, and that's 701-401-D. There's another one which I think is more relevant, which is ORS 701-560-7, which defines a contractor in the context of construction and when, if there is a defect or problem, the homeowner has to notify, in this case the subcontractor, about the possible defect in order to possibly cure it. And that is subcontractor means any person that provides services for the construction, alteration, or repair of a residence at the request or direction of a contractor. That request or direction language is language of agency. And we have cited the Vaughn case, Your Honor, and the Vaughn case is an analysis by our Supreme Court of another statute, the Ardentort Claims Act, and it involved a contract between the Port of Portland and a provider of transit services. And somebody was injured in the vehicle. They sued the contractor, and the contractor said, wait a minute, we're agents of the Port of Portland, even though there's a contract. Ultimately, when it got to the Supreme Court, the Supreme Court applied the traditional agency test to the relationship and stated that an individual must be subject to the unnoticed control and the individual must act on behalf of the other person and determined that they were, in fact, agents and therefore subject to the Tort Claims Act, which had notice provisions and limitations and liability. Well, is there a claim in this case that the damage was done by a subcontractor? The language, we say yes, because what it says is Wilmar did it or it's agents. And my point is that in Oregon, the word agent subsumes or includes subcontractors, and the statute I read when it talks about the contractor providing services at the request and direction of a contractor is agency type of language. The intent there was to cover that. That's all well and good in your suit against them, but how does that impact the subsidence language? It doesn't impact the subsidence language. It's a separate basis, essentially a separate exclusion. You're defeating one of their other claims. There's many of them. It's a machine gun approach to denying coverage as well as assumptions. So we've tried to deal with them all. The two additional citations are that subsection 7 of the Oregon statute and the Vaughn case, or was that in your original brief? The Vaughn case is not in our, I'm sorry, and I will, it's Vaughn v. First Transit. So what you can do on those is that we actually have a little piece of paper that the clerk has. You can just fill that out, and then the court has provided the specific citation. Thank you, Your Honor. Thank you. I appreciate it. Any further questions? I think not. Thank you. Briefly in reply, I think that getting back to the basic, the first step in evaluating the policy language at issue, and I'm referring to the lands subsidence issues, is it has to be read to determine whether it has a fair and reasonable meaning. We believe it does. Simply, if there is land subsidence and there's liability that flows from land subsidence, then there is no coverage by operation of this exclusion. It doesn't depend upon the cause, and I know that there's been reference to other policy exclusions that have cause language, but I would note that at least in addition to the land subsidence exclusion, the employment-related practices exclusion, the total pollution exclusion, the total lead exclusion, the urea formaldehyde exclusion, none of those contain any causation language. So if we're going down this road, what I'm hearing then is all of these exclusions are by their very nature ambiguous because they don't reference cause, and I simply can't believe that that's the outcome of the failure to include any causation language in an exclusion. And frankly, there is no authority that we've been provided or the court's been provided that would stand for that proposition. Now, there was a reference to products completed operations coverage. I think that there has been some confusion over that, and that is this. It's not intended to provide coverage for the damage to the insured's product or work, and that's really what we're talking about here. The house is the work. It's been admitted. It was what the underlying court found, and we believe that the products completed operations hazard doesn't apply here. But there is no dispute about how one analyzes the duty to defend issue. It is what then happens, and I think it's important to note that after reviewing the complaint, reviewing the relevant policies, that there is no coverage for an insured's work. There is no coverage for damage that arose out of earth movement, and we believe that the denial of the duty to defend was appropriate and that district court's ruling should be reversed and that this court, as a matter of law, should determine that the declination was appropriate. Thank you. Thank you. I'd like to thank both counsel for your very helpful and very clear arguments. The last case today, and we now have submitted Wilmar v. Illinois Insurance, and we're adjourned for the morning. Thank you.
judges: Guy, McKeown, Tallman